## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DAVON JACKSON** | **CIVIL ACTION** |
| **VERSUS** | **NO.  17-00265** |
| **DARREL VANNOY, WARDEN** | **SECTION "F"(4)** |

### REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2) (2006).[1]

### I.    Factual Background

The petitioner, Davon Jackson ("Jackson"), is a convicted inmate incarcerated in the Louisiana State Penitentiary, in Angola, Louisiana.[2]  On January 2, 2003, Jackson was indicted by a Grand Jury in Orleans Parish for one count of second degree murder.[3]  Jackson entered a plea of not guilty in the case.[4]

---

[1]Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2]Rec. Doc. 15, p. 1.

[3]St. Rec. Vol. 1 of 9, Bill of Indictment, 1/2/03.

[4]St. Rec. Vol. 1 of 9, Minute Entry, 1/14/03.

The record reflects that on July 5, 2001, the body of Anthony St. Pierre was found at his residence at 12631 North Lake Carmel Drive in New Orleans East.[5] St. Pierre was found in his bedroom lying face up near the side of the bed and had sustained multiple gunshot wounds. His hands and feet were bound.

According to Detective Darryl Ribet, the initial lead investigator on the case, there were no signs of forced entry to the house. Ribet testified that the house was not ransacked, but the bedroom looked like it had been rummaged through.

On the morning of July 6, 2001, Dr. William Newman, an expert in forensic pathology, conducted St. Pierre's autopsy. Dr. Newman noted that St. Pierre's hands had been tied behind his back with pantyhose, and his legs had been tied together with stretch pants. St. Pierre sustained five gunshot wounds, each with a corresponding exit wound. The testing of the fluids collected from St. Pierre's body was negative for crack cocaine, heroin, and marijuana, and his blood alcohol content was 0.01%. St. Pierre's lower abdomen had some discoloration which indicated that he had been dead for more than twenty-four hours. Dr. Newman estimated that St. Pierre had been dead for approximately thirty-six to forty-eight hours and that he likely died sometime on July 4, 2001.

Aaronne Simmons testified that St. Pierre was his godfather. He identified photographs of St. Pierre and his dogs, one of whom Simmons took possession of after the murder. Simmons explained that St. Pierre and Lakesha Alexis worked together at Medical Cart Pharmacy on Lake Forest Boulevard. Simmons testified that St. Pierre did not answer when he called him on the evening of July 4, 2001. After St. Pierre did not answer his telephone the next day,

---

[5]The facts were taken from the unpublished opinion of the Louisiana Fourth Circuit Court of Appeal on direct appeal. *State v. Jackson*, 17 So. 3d 523, 2009 WL 8688915 (La. App. 4th Cir. Sept. 9, 2009) (Table, Text in Westlaw); St. Rec. Vol. 7 of 9, 4th Cir. Opinion, 2008-KA-1292, 9/9/09.

Simmons called his work, but no one answered the phone. Simmons went to the pharmacy, but St. Pierre was not there. Simmons became concerned that something was wrong so he borrowed a gun from a friend and had his wife drive him to St. Pierre's house. When he arrived, Alexis and another pharmacy employee were waiting outside of the house. Simmons entered the house and called for St. Pierre, but there was no answer. Upon opening the bedroom door, Simmons found St. Pierre lying on the floor with his hands and feet bound. Simmons recalled that one of St. Pierre's dogs had been enclosed in the room. Simmons testified that he let the dog out into the backyard and the dog generally would not allow anyone unknown to it to enter the house. He then asked Alexis to call the police. Simmons recalled that he spoke with an officer named Desmond Julian who was on the scene but was not on duty that day. He then went home and returned the gun to the man from whom he had borrowed it.

Louisiana State Trooper Desmond Julian was an officer for the New Orleans Police Department at the time of St. Pierre's murder. He testified that he had been a friend of St. Pierre since childhood and that Julian and Jackson were cousins. Julian explained that he introduced Jackson and St. Pierre in 1989 or 1990. Julian testified that, although he was off duty on July 5, 2001, he went to St. Pierre's house when he heard about the murder, but explained that he was not permitted to enter the house. He recalled that many people were on the scene that day including Simmons and Alexis. Julian recalled speaking with Simmons, who was very upset and crying.

Lakesha Alexis testified that St. Pierre was the pharmacist at Medical Cart Pharmacy where she worked as a pharmacy technician in July 2001. Alexis and St. Pierre became very good friends over the two years they worked together. Alexis explained that St. Pierre had many other friends who would visit him at the pharmacy. She identified Simmons and Julian

as friends of St. Pierre.  She testified that Jackson also visited the pharmacy often, but that St. Pierre would usually go outside to speak with Jackson.  Alexis testified that she usually answered the telephone at the pharmacy, and she recognized Jackson's voice.  She recalled that on July 3, 2001, St. Pierre and Jackson argued many times over the phone, and that St. Pierre was very upset and in tears and slammed down the phone many times.  She testified that St. Pierre told her that Jackson kept asking him for money to buy a new outfit for the holiday.  She explained that St. Pierre told her that he was tired of giving Davon Jackson money and he refused to give him money on this occasion.  She stated that St. Pierre was the most upset that she had ever seen him and that St. Pierre was still upset when she called him later that evening.

The morning of July 5, 2001, St. Pierre was not at the pharmacy when Alexis arrived so she waited outside until another worker let her in the building.  As Alexis could not start work in the pharmacy until St. Pierre arrived, she called his cell phone, but determined that it was turned off.  She drove to St. Pierre's house and rang the bell and knocked on the door.  Alexis stated that St. Pierre's two large dogs did not come to the door but that she could hear them barking inside the house.  Alexis found the door unlocked, but she closed the door because she feared something was wrong.  After she called the pharmacy, her coworker Kevin and a customer named John arrived, as did Simmons who drove up in a car with a young woman.  Alexis, John, and Simmons went inside the house, and Simmons and John knocked on the bedroom door.  Alexis could hear dogs inside the bedroom, growling and barking.  She stayed back while Simmons opened the door.  The men told her that St. Pierre was dead and tied up and asked her to call the police.  Alexis ran outside and called 911.  She indicated that Simmons was still on the scene when the police arrived.  Julian arrived on the scene at some point, but

Alexis did not remember seeing him speaking with Simmons, nor did she remember when Simmons left.  She identified a tape of the 911 call she made, which was played for the jury.

Rita Levy, St. Pierre's sister, testified that she had not visited him very much in the last few years of his life.  She testified that, prior to the murder, there were no guards at the entrance to St. Pierre's subdivision.  Levy recalled that she met Jackson once in 1999 when he accompanied St. Pierre to a family meeting at her house following the death of her father.  She recalled that Jackson did not attend St. Pierre's funeral.  Levy explained that she and her son went to clean St. Pierre's house a few days after the murder.  Her son found a bullet under the carpet which police officers came and retrieved.  Levy also found a stack of personal papers that included some letters Jackson wrote to St. Pierre.

Cassandra Jackson, a friend of Davon Jackson, gave a statement to two detectives in August 2001 wherein she admitted that she drove Davon Jackson to St. Pierre's house to retrieve clothing on July 4, 2001, around 10:30 or 11:00 a.m.  At trial, Cassandra Jackson testified that Davon Jackson had stayed with her on July 3, 2001.  She admitted that she took Jackson to a house to retrieve clothes, but initially insisted it was before July 4, 2001.  She testified that Jackson was inside the house less than a minute and returned with a bag of clothes.  She first testified that after Jackson returned to the car they then drove to a nearby gas station where Davon Jackson paid for gas.  Cassandra Jackson testified that they then returned to her house and Jackson left.  She admitted that she did not see Jackson until the next day.

When shown a picture of St. Pierre's house, she claimed she did not recognize it.  Cassandra Jackson admitted that the detectives had shown her a photograph of a house, but testified that she did not remember if she told them that it was the house where she took Jackson.  She initially testified that she did not know if St. Pierre's house was the place where she took

5

Jackson. She later testified that it was not the house, but then changed her mind again and said she was not sure if it was the house.

Cassandra Jackson admitted to giving detectives a statement, but claimed that she was scared when she gave the statement and told the detectives many false things. She first denied telling the detectives that Jackson had keys to the house when he exited the car. She then admitted that she told the detectives that he had keys, but stated that she lied. She claimed that she did not recall telling the detectives that Jackson was inside the house thirty minutes to an hour. She also did not recall telling the detectives that Jackson gave her a black bag containing clothing and shoes. She denied telling the detectives that Jackson did not get back in the car with her, but instead he walked to a nearby gas station, where he met her and she threw away the bag. She eventually admitted that Jackson walked to the gas station and met her there, but she denied that she was at the gas station for twenty minutes before he arrived.

After listening to the audiotape of her statement to the detectives, Cassandra Jackson admitted that she told police she brought Davon Jackson to the house on July 4, 2001. She also admitted telling the detectives that Davon Jackson had keys in his hand when he walked towards the house, that he was in the house thirty minutes to an hour, and that she waited at the gas station for twenty minutes.

On cross-examination, Cassandra Jackson denied taking Davon Jackson to the house on July 4, 2001 and claimed she had taken him there weeks before. She claimed the detectives had threatened to charge her if she did not admit she took Jackson to the house on July 4, 2001. On re-direct, Cassandra Jackson admitted that she had told the prosecutor immediately prior to trial that she took Davon Jackson to the house in early July 2001.

Kerry Kennedy, who was married to Davon Jackson's cousin, testified that sometime around July 4, 2001, he attended the funeral of the grandfather of his wife and Jackson. According to Kennedy, Davon Jackson did not attend the funeral. Kennedy recalled that, sometime later that month, he had a conversation with Jackson at a second line parade. Kennedy asked Jackson why he had not attended his grandfather's funeral. Jackson asked Kennedy if he had heard what had happened to St. Pierre. When Kennedy told Jackson that he had heard about the murder, Jackson asked him if he knew what happened. Kennedy told him he did not and Jackson replied, "I had to take him under, take him out." Kennedy testified that Jackson told him that St. Pierre was playing "gay games with him, trying to return and do sexual favors." Kennedy recalled that Jackson told him, "Man, I got tired – tired of him playing with me with them sexual favors. I took him out. I took him under." Jackson then showed him two nine-millimeter guns and asked Kennedy if he wanted to buy them. Kennedy told Jackson he was interested in the guns, but testified that he did so just to get away from Jackson. He stated that after he left Jackson, he and his wife and children went home.

Kennedy did not call the police although his wife urged him to do so. A few days later, when Kennedy saw Detective Dwight Deal jogging in a park, he told him about his conversation with Jackson. Detective Deal put Kennedy in touch with the officers working on the St. Pierre case. Thereafter, Kennedy gave statements to the police on two occasions, one of which was recorded. Kennedy testified that after meeting with police he was supposed to attempt to purchase the guns from Jackson, but that Jackson was arrested before he could do so.

Officer Michael DiMarco testified that he and his partner, Donald Hayes, conducted a traffic stop of Jackson on July 11, 2001. Officer DiMarco stated that Jackson, who was driving a tan Mercury vehicle at a high rate of speed, drove the wrong way down Barracks Street. He then

backed up the car and drove towards Officer DiMarco's vehicle. The officers effected a traffic stop. As he approached the vehicle, DiMarco noticed suspicious movements by the occupants. DiMarco ordered Jackson and the passenger out of the car. After they had exited, DiMarco looked inside the car and saw the butt of a handgun sticking out from under the seat. He placed Jackson and his passenger in handcuffs and then retrieved a loaded nine-millimeter gun.

On August 1, 2001, Lieutenant Michael Mims of the New Orleans Police Department took a statement from Davon Jackson after advising him of his rights. Jackson told Mims that he had not seen St. Pierre since June 2001. Jackson claimed that he was at the home of Cynthia Jackson, his aunt, in the Iberville Housing Project on July 4, 2001. Davon Jackson said he then went to an amusement arcade in the French Quarter and later went to his grandmother's house in the Ninth Ward. Mims testified that Davon Jackson did not give him an address or telephone number for his aunt. Mims was unable to find Jackson's aunt's name amongst either the computer listing or a book of Iberville Housing Project residents. When Mims and Detective Ribet went to the arcade in an attempt to confirm whether Jackson was there on July 4, 2001, they learned that the arcade did not have surveillance cameras. Mims testified that no one was at home at Jackson's grandmother's house, which was the address Jackson gave at the time of his arrest. Mims also testified that a Bryco Arms Jennings Model 9 nine-millimeter semi-automatic pistol was confiscated from the vehicle Jackson was driving on July 11, 2001.

Cynthia Jackson Slaughter, Jackson's aunt, testified that in July 2001 she lived in an apartment in the Iberville Housing Project with various relatives. According to Slaughter, Davon Jackson spent the night at her apartment on July 3, 2001, and remained there most of July 4, 2001. There was a large family gathering at the apartment on July 4, 2001. Slaughter recalled that Jackson left for a brief time in the afternoon with his cousins to go to the store. She testified that,

8

at some time before 9:00 p.m., Jackson and others left to go to the French Quarter to see the fireworks.

Tonya Jackson, Davon Jackson's sister, lived at Slaughter's apartment. According to Tonya Jackson, Davon Jackson spent the night at the apartment on July 3, 2001, and remained there on July 4, 2001. She testified that on the evening of July 4, 2001, she, her cousins and their friends, and Jackson went to an arcade on Canal Street where they remained until approximately 3:00 a.m. She stated that Davon Jackson was with them when they walked back to her aunt's apartment.

Patricia Arnolie lived next door to St. Pierre at the time of his murder. She recalled that when she left her house on July 4, 2001, sometime between 12:30 and 1:00 p.m., she saw St. Pierre on his roof pruning trees. Arnolie returned with her children sometime between 9:30 and 10:00 p.m. At that time, she saw St. Pierre's dogs running up and down in his yard. She stated that she had never seen them out running around like that. She stated that St. Pierre's dogs were not outside barking on the morning of July 5, 2001.

Kenneth Leary, a firearms examiner with the New Orleans Police Department Crime Lab, examined two nine-millimeter cartridge casings and two nine-millimeter bullets recovered from the crime scene. Leary concluded that the casings and bullets were each fired from the same weapon and that the weapon was a Bryco Arms Jennings Model 9 nine-millimeter semi-automatic pistol.

Jackson was tried by a jury on December 10, 2007, through December 14, 2007, and Jackson was found guilty as charged.[6] During the trial, jurors accompanied the Trial Judge to a

---

[6]St. Rec. Vol. 1 of 9, Trial Minutes, 12/10/07; Trial Minutes 12/11/07; Trial Minutes, 12/12/07; Trial Minutes, 12/13/07; Trial Minutes, 12/14/07; Verdict, 12/14/07; St. Rec. Vol. 3 of 9, Trial Transcript, 12/10/07-12/14/07; St. Rec. Vol. 3 of 9, Trial Transcript, 12/10/17-12/14/17 (con't).

meeting at the City Council Chamber where members of the Criminal Justice Leadership Alliance, including the Trial Judge and one of the prosecutors, spoke.[7] Later that afternoon, defense counsel objected to the jury's "field trip" and moved for a mistrial.[8] The Trial Court denied the motion.[9]

The Trial Court denied Jackson's motion for new trial and post-judgment verdict of acquittal as well as his supplemental motion for mistrial and motion for new trial.[10] On January 2, 2008, the Trial Court sentenced Jackson to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence.[11]

On direct appeal, Jackson's appellate counsel asserted four errors[12]: (1) the Trial Court erred in admitting into evidence letters purportedly written by Jackson to the victim; (2) the Trial Court erred by taking the jury on a "field trip" during trial to a meeting at the New Orleans Council Chamber; (3) the Trial Court erred in denying Jackson's motion for mistrial based upon the prosecution's comment on his invocation of his right not to testify; and (4) the evidence of identity was insufficient to sustain Jackson's conviction. The Louisiana Fourth Circuit affirmed the conviction finding no merit in the issues raised on September 9, 2008.[13]

---

[7] St. Rec. Vol. 3 of 9, Trial Transcript, pp. 143, 147, 197-98, 12/10/07-12/14/07; St. Rec. Vol. 1 of 9, Criminal Justice Conference Transcript, 12/12/07.

[8] St. Rec. Vol. 3 of 9, Trial Transcript, pp. 197-98, 12/10/07-12/14/07

[9] *Id.*, at p. 198.

[10] St. Rec. Vol. 1 of 9, Motion for New Trial and for Post-Verdict Judgment of Acquittal, 12/19/07; Supplement to Motion for Mistrial and Motion for New Trial, 1/02/08; Supplement to Motion for Mistrial and Motion for New Trial, 3/308; Minute Entry, 1/2/08; St. Rec. Vol. 4 of 9, Hearing Transcript, 1/2/08.

[11] St. Rec. Vol. 1 of 9, Sentencing Minutes, 1/2/08; Sentence of the Court, 1/2/08; St. Rec. Vol. 4 of 9, Sentencing Transcript, 1/2/08.

[12] St. Rec. Vol. 7 of 9, Appeal Brief, 2008-KA-1292, 2/5/09.

[13] *State v. Jackson*, 17 So. 3d 523, 2009 WL 8688915 (La. App. 4th Cir. Sept. 9, 2009) (Table, Text in Westlaw); St. Rec. Vol. 7 of 9, 4th Cir. Opinion, 2008-KA-1292, 9/09/09.

On October 9, 2009, Jackson's counsel filed a writ application with the Louisiana Supreme Court.[14]  On October 16, 2009, Jackson filed a pro se writ application.[15]  On April 23, 2010, the Louisiana Supreme Court denied Jackson's writ applications without stated reasons.[16]  His conviction was final under federal law ninety (90) days later, on July 22, 2010, when he did not file a writ application with the United States Supreme Court.  *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. Sup. Ct. Rule 13(1)).

On July 14, 2011, Jackson submitted pro se to the Trial Court an application for post-conviction relief and brief in which he raised the following grounds for relief[17]: (1) actual innocence; (2) denial of his right to due process and a fair trial when the Trial Judge took the jurors on a "field trip" to the City Council Chamber; (3) denial of effective assistance of counsel during a critical stage of the proceedings; (4) ineffective assistance of trial counseling in failing to (a) contemporaneously object to the "field trip"; (b) investigate and present impeachment evidence attacking the credibility of state witnesses; (c) effectively confront firearm testimony; (d) lodge critical objections; (e) move for a mistrial after the prosecutor's closing argument; (f) present mitigating evidence in support of a sentence less than life imprisonment; and (g) move for reconsideration of the excessive sentence; (5) his appellate counsel was ineffective in failing to (a)

---

[14]La. S. Ct. Writ Application, 09-KO-2196, 10/09/09.

[15]La. S. Ct. Writ Application, 09-KO-2262, 10/16/09 (postmarked 10/08/09).

[16]*State v. Jackson*, 34 So. 3d 272 (La. 2010); St. Rec. Vol. 7 of 7, La. S. Ct. Order, 2009-K-2196, 4/23/10; La. S. Ct. Order, 2009-KO-2262, 4/23/10.

[17]St. Rec. Vol. 8 of 9, Application for Post-Conviction Relief, 7/22/11 (dated 7/14/11).

effectively present the issues assigned; and (b) raise other issues on appeal including violation of jury sequestration under La. Code Crim. P. art. 791, violation of the right to be present under La. Code Crim. P. art. 831(5), excessive sentence on appeal, non-unanimous verdict, and violation of right to poll the jury; (6) his sentence constituted cruel and unusual punishment; (7) the non-unanimous verdict violated his constitutional rights; and (8) newly discovered evidence.

The Trial Court granted the State's procedural objections to claims one, six, seven, and eight.[18] Jackson filed a counseled writ application with the Fourth Circuit on December 17, 2012.[19] The Fourth Circuit denied relief finding the non-unanimous jury verdict claim to not be constitutionally valid, the excessive sentencing claim not to be a basis for post-conviction relief, the claim that new evidence undermined forensic expert testimony to be procedurally barred as not preserved for review, and the actual innocence claim as barred.[20] On September 27, 2013, the Louisiana Supreme Court did not consider Jackson's related writ application finding it untimely under La. S. Ct. Rule X § 5.[21]

The Trial Court held a hearing on July 25, 2014, and denied the post-conviction application on August 21, 2015, finding Jackson's remaining claims to be without merit.[22] On January 26, 2016, the Louisiana Fourth Circuit denied Jackson's writ application.[23] Jackson filed an

---

[18]St. Rec. Vol. 8 of 9, Hearing Transcript, 10/16/12.

[19]St. Rec. Vol. 8 of 9, 4th Cir. Writ Application, 2012-K-1729, 12/17/12.

[20]St. Rec. Vol. 8 of 9, 4th Cir. Order, 2012-K-1729, 2/25/13.

[21]St. Rec. Vol. 8 of 9, La. S. Ct. Order, 2013-KP-0920, 9/27/2013; La. S. Ct. Writ Application, 13 KP 920, 4/25/13.

[22]St. Rec. Vol. 9 of 9, Trial Court Judgment, 8/21/15; Hearing Transcript, 7/25/14.

[23]St. Rec. Vol. 9 of 9, 4th Cir. Order, 2015-K-1195, 1/26/16; 4th Cir. Writ Application, 15-K-1195, 11/2/15.

application for supervisory writs with the Louisiana Supreme Court in February 25, 2016.[24]  On January 9, 2017, the Louisiana Supreme Court denied writs without stated reasons.[25]

## II.    Federal Habeas Petition

On January 10, 2017, Jackson filed a counseled petition for federal habeas corpus relief in which he asserts the following grounds for relief[26]: (1) actual innocence; (2) the juror "field trip" violated his rights to due process and a fair trial; (3) denial of effective assistance of counsel during a critical stage of the proceedings; (4) ineffective assistance of trial counsel; (5) ineffective assistance of appellate counsel; (6) excessive sentence; (7) non-unanimous verdict; and (8) newly discovered evidence.

The State filed a response in opposition to the petition asserting that Jackson timely filed his federal petition.[27]  The State asserts that four claims are not exhausted and are procedurally barred, and the remaining claims can be dismissed as meritless.

## III.    General Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[28] applies to this petition, which is deemed filed in this Court on January 10,

---

[24]St. Rec. Vol. 9 of 9, La. S. Ct. Writ Application, 16 KP 352, 2/25/16.

[25]*State ex rel. Jackson v. State*, 208 So. 3d 883 (La. 2017) (per curiam); St. Rec. Vol. 9 of 9, La. S. Ct. Order, 2016-KP-0352, 1/9/17.

[26]Rec. Doc. No. 1.

[27]Rec. Doc. No. 15.

[28]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996.  *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

2017.  The threshold questions on habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and the claims must not be in "procedural default."  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State concedes Jackson timely filed his federal petition and exhausted his claims enumerated as claims two, three, four, and five.  The State contends that Jackson failed to exhaust his other four claims and that they are in technical procedural default.  It contends that Jackson's remaining claims can be dismissed as meritless.[29]

## IV.  Exhaustion Doctrine and Procedural Default

"A fundamental prerequisite to federal habeas relief under § 2254 is the exhaustion of all claims in state court prior to requesting federal collateral relief."  *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998) (citing *Rose v. Lundy*, 455 U.S. 509, 519-20 (1982)); *Nobles*, 127 F.3d at 419.  "A federal habeas petition should be dismissed if state remedies have not been exhausted as to all of the federal court claims."  *Whitehead*, 157 F.3d at 387 (citing 28 U.S.C. § 2254(b)(1)(A); *Rose*, 455 U.S. at 519-20).

The well-established test for exhaustion requires that the substance of the federal habeas claim be fairly presented to the highest state court in a procedurally proper manner.  *Whitehead*, 157 F.3d at 387 (citing *Picard v. Connor*, 404 U.S. 270, 275-78 (1971)).  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary

---

[29]Rec. Doc. No. 15.

review when that review is part of the State's ordinary appellate review procedures. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "A federal court claim must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the 'fairly presented' requirement." *Whitehead*, 157 F.3d at 387 (citing *Picard*, 404 U.S. at 275-78). "This requirement is not satisfied if the petitioner presents new legal theories or new factual claims in his federal application." *Id.*, 157 F.3d at 387 (citing *Nobles*, 127 F.3d at 420); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001).

For exhaustion purposes, it also is not enough for a petitioner to have raised the claims in the lower state courts if the claims were not specifically presented to the State's highest court, and vice versa. *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). Furthermore, a petitioner does not fairly present a claim to the State's highest court if that court must read beyond the petition or brief, such as a lower court opinion, to find a claim not otherwise specifically raised. *Id.*, 541 U.S. at 32.

The record shows, and the State concedes, that Jackson (through counsel) exhausted state court review of the claims listed above as federal claims two, three, four and five. However, the record also reveals that Jackson has not exhausted state court review of the other claims and arguments raised.

A review of the state court pleadings reflects that Jackson raised his claims of actual innocence (claim one), excessive sentence (claim six), non-unanimous verdict (claim seven), and newly discovered evidence (claim eight) in his application for post-conviction relief and in his writ application to the Fourth Circuit. His attempt to seek review in the Louisiana Supreme Court included these claims.

However, Jackson's writ application to the Louisiana Supreme Court was not considered by the Court because it was not timely filed. It is clear that a claim presented in an untimely writ application has not been "fairly presented" for exhaustion purposes. *See, e .g., Murphy v. Cooper*,

15

Civ. Action No. 12–1339, 2012 WL 5463864, at *5 (E.D. La. Oct. 1, 2012), *adopted*, 2012 WL 5463857 (E.D. La. Nov. 8, 2012) (citing *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir.1988) (noting that a state court has a fair opportunity to pass upon a claim only if it is presented to the court in "a procedurally proper manner according to the rules of the state courts")); *Bias v. Wendom*, Civ. Action No. 6:15–cv–0630, 2015 WL 4545142, at *6 (W.D. La. July 27, 2015) (petitioner failed to exhaust claims where his sole writ application to Louisiana Supreme Court was untimely and not properly filed), *certificate of appealability denied*, 15-30719 (5th Cir. June 14, 2016). As the United States Supreme Court has reiterated, when a pleading is untimely under state law, "that [is] the end of the matter" and the pleading was not properly filed. *See Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005). Therefore, these four claims — actual innocence, excessive sentence, non-unanimous verdict, and newly discovered evidence — were not presented to the Louisiana Supreme Court in a procedurally proper manner and cannot be considered to have been exhausted.

Normally, the Court would recommend that Jackson's petition be dismissed without prejudice to allow him to pursue exhaustion of his claims in the appropriate state courts. However, unexhausted claims, those claims which were not "fairly presented" to the state courts, may be considered "technically" exhausted if the habeas petitioner is now prohibited from litigating those claims in the state courts because of some procedural rule. If that is so, then those "technically" exhausted habeas claims might be considered procedurally defaulted.

If a claim has not been adjudicated on the merits in state court, federal review of that claim may be barred by the doctrine of procedural default if the petitioner has failed to meet state procedural requirements for presenting his federal claims, thereby depriving the state courts of an opportunity to address those claims in the first instance. *See Cone v. Bell*, 556 U.S. 449, 465 (2009) (noting that, "[w]hen a petitioner fails to properly raise his federal claims in state court, he

deprives the State of 'an opportunity to address those claims in the first instance' and frustrates the State's ability to honor his constitutional rights") (quoting *Coleman v. Thompson*, 501 U.S. 722, 732 (1991)).   When state court remedies are rendered unavailable by the petitioner's own procedural default, federal courts are normally barred from reviewing those claims.  *See Coleman*, 501 U.S. at 722.  "[I]f the petitioner failed to exhaust state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, ... [then] there is a procedural default for purposes of federal habeas ..."  *Id.*, at 735 n. 1.

A petitioner has "technically exhausted" his claims if he fails to properly and timely present them to each level of the Louisiana courts and thereafter would be barred from seeking relief in those courts.  *Magouirk v. Phillips*, 144 F.3d 348, 358 (5th Cir. 1998) (citing *Coleman*, 501 U.S. at 731–33 and *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995)); *Fuller v. Johnson*, 158 F.3d 903, 905–06 (5th Cir. 1998).  In such a case, there is no difference between non-exhaustion and procedural default.  *Magouirk*, 144 F.3d at 358.  Accordingly, when a petitioner fails to exhaust state court remedies because he has allowed his federal claims to lapse, those claims are "technically" procedurally defaulted and may be dismissed.  *Id.*

In this case, it is reasonable to conclude that Jackson is now unable to litigate claims one, six, seven and eight in the Louisiana courts, and that any attempt to litigate these claims would result in dismissal on state procedural grounds.  Based on the record and the fact that he has already had a prior post-conviction application in the state courts, any attempt to litigate these claims now would likely be dismissed as repetitive under La. Code Crim. P. art. 930.4(D) or (E)[30] or as time-

---

[30]Art. 930.4(D) provides that "[a] successive application may be dismissed if it fails to raise a new or different claim."  Art. 930.4(E) also provides "[a] successive application may be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application."

barred by the provisions of La. Code Crim. P. art. 930.8.[31]    Therefore, the claims are now considered procedurally defaulted.  *Sones*, 61 F.3d at 416 (citing *Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993)).  The procedural default doctrine bars federal habeas corpus review if the state courts would now refuse to address a habeas petitioner's unexhausted federal claims because litigation of those claims would be barred by state procedural rules.

Federal habeas review of a "technically" exhausted and now procedurally defaulted claim is barred "... unless the prisoner can demonstrate cause for the default and actual prejudice as result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750–51.

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  The mere fact that a petitioner or his counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.  *Id.* at 486.

In this case, Jackson has not offered any cause for the default which would excuse the procedural bar imposed by the Louisiana Supreme Court.  The Court's review of the record does not support a finding that any factor external to the defense prevented Jackson from raising the claims in a procedurally proper manner.  The record also does not reflect any action or inaction on the part of the State which prevented him from doing so.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." *Hogue v. Johnson*, 131 F.3d 466, 497

---

[31] Art. 930.8 provides a two-year period of limitations for filing applications for post-conviction relief and that period generally runs from the date that the applicant's judgment of conviction becomes final under Louisiana law, which for Jackson was in 2010.

(5th Cir. 1997) (citing *Engle v. Isaac*, 456 U.S. 1707, 134 n.43 (1982)). Having failed to show an objective cause for his default, the Court need not determine whether prejudice existed, and petitioner has not alleged any actual prejudice. *Ratcliff v. Estelle*, 597 F.2d 474, 477 (5th Cir. 1979) (citing *Lumpkin v. Ricketts*, 551 F.2d 680, 681–82 (5th Cir. 1977)).

Jackson's defaulted arguments are therefore procedurally barred from review by this federal habeas corpus court. *See Trest v. Whitley*, 94 F.3d 1005, 1008 (5th Cir. 1996) (finding habeas review precluded when petitioner neglected to allege actual prejudice and cause of failure to comply with state procedural rule concerning time restriction on filing for state post-conviction relief), *vacated on other grounds*, 522 U.S. 87 (1998).[32]

Jackson may avoid this procedural bar only if a fundamental miscarriage of justice will occur if the merits of his claim are not reviewed. *Hogue*, 131 F.3d 497 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). To establish a fundamental miscarriage of justice, Jackson must provide this court with evidence that would support a "colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986); *accord Murray,* 477 U.S. at 496; *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997). To satisfy the factual innocence standard, Petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt. *Campos v. Johnson*, 958 F. Supp. 1180, 1195 (W.D. Tex. 1997) (footnote omitted); *see Nobles*, 127 F.3d at 423 n.33 (actual innocence factor requires a showing by clear and convincing evidence that, "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.").

---

[32]The Supreme Court vacated the Fifth Circuit's opinion on grounds that a court of appeals is not required to raise the procedural default argument *sua sponte*. *Id.*

The Court recognizes that Jackson has raised a claim of actual innocence (claim one) as an independent substantive ground for habeas relief. However, the United States Supreme Court has not recognized any free-standing actual innocence claim to support habeas relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (citing *Herrera*, 506 U.S. at 404-05); *Coleman v. Thaler*, 716 F.3d 895, 908 (5th Cir. 2013); *Burton v. Stephens*, 543 F. App'x 451, 458 (5th Cir. 2013) (citing *McQuiggin*, 569 U.S. at 392 and *Herrera*, 506 U.S. at 400); *In re Warren*, 537 F. App'x 457 (5th Cir. 2013). The Supreme Court, however, has recognized that a credible showing of actual innocence may act as a gateway to overcome a procedurally defaulted or untimely filed federal habeas corpus claim. *McQuiggin*, 569 U.S. at 392. Because there is no underlying constitutional violation in Jackson's actual innocence claim (claim one), it is not cognizable.

Under a broad reading, Jackson may intend for the Court to consider his arguments as related to the actual innocence exception to the state imposed procedural bar to review of his federal habeas claims of excessive sentence, non-unanimous jury, and newly discovered evidence. Nevertheless, Jackson has not met the rigorous burden of proof imposed under the actual innocence exception to excuse his procedural default of those claims.

The actual innocence standard encompasses three principles. First, a "credible [actual innocence] claim requires new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *House v. Bell*, 547 U.S. 518, 537 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). The United States Fifth Circuit Court of Appeals has held that evidence is "not 'new' [when] it was always within the reach of [petitioner's] personal knowledge or reasonable investigation." *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008). Second, the court's analysis is not limited to the new evidence presented by a petitioner in support of his actual innocence claim. *Id*. "The

habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that govern at trial." *Bell,* 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327).  In doing so, the court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Schlup*, 513 U.S. at 331-32.  Third, the "demanding" actual innocence standard "permits review only in the extraordinary case."  *Bell*, 547 U.S. at 538 (citation omitted); *see also Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) ("[O]ur precedent confirms that the mountain ... a petitioner must scale in order to prove a fundamental miscarriage claim is daunting indeed.").

Jackson attempts to make a colorable showing of factual innocence by pointing to the 2009 report from the National Academy of Sciences, S*trengthening Forensic Science in the United States: A Path Forward*, calling into question the ability of toolmark analysis to individuate shell casings.  Jackson claims the report undermines Leary's testimony that the bullets and casings from the crime scene came from the firearm found during a search of the vehicle Jackson was driving on July 11, 2001.  He also attacks the credibility of Cassandra Jackson, as he did at trial, and claims that he was celebrating with his family on July 4, 2001.

The report is not newly discovered evidence.  *Spear v. Ryan*, No. CV-00-01051-PHX-SMM, 2016 WL 6699681, at *3-5 (D. Ariz. Nov. 15, 2016) (citing *Rues v. Denney*, No. 5:09–CV–06056–DGK, 2010 WL 1729181, at *2 (W.D. Miss. April 29, 2010) ("As a threshold matter the February 18, 2009 report does not constitute newly discovered evidence. While this particular report may be new, the arguments it advances are not.  The gist of the report—that forensic methodologies have not been sufficiently studied in peer reviewed journals to be accepted as scientifically accurate—is not new."), *aff'd*, 643 F.3d 618, 620 (8th Cir. 2011)).

Further, the report is insufficient, when considered in light of all of the evidence presented at trial, to show that it is more likely than not that no reasonable juror would have convicted Jackson. The uncontested evidence demonstrated that Jackson and St. Pierre had a heated argument on July 3, 2001.[33] There was evidence that Jackson was at St. Pierre's house for thirty minutes to an hour on July 4, 2001, and that he left the house carrying a black bag, which he threw in a dumpster.[34] There was uncontroverted evidence that Jackson admitted to Kennedy that he committed the murder and that Jackson showed Kennedy two nine-millimeter firearms which he offered to sell him.[35] Additionally, a nine-millimeter firearm was found during a traffic stop of the vehicle Jackson was driving.[36] That vehicle was the same vehicle that Cassandra Jackson used to take Jackson to St. Pierre's house on July 4, 2001.[37]

While Jackson presented alibi evidence at trial, that evidence was inconsistent. For instance, Cassandra Jackson testified that Jackson spent the night with her on July 3, 2001, while Slaughter and Tonya Jackson testified that he spent the night at Slaughter's apartment.[38] Additionally, while Tonya Jackson claimed that Davon Jackson returned to the apartment with her in the early morning of July 5, 2001, Davon Jackson told detectives that he went to his grandmother's house.[39] Jackson's attack on the credibility of Cassandra Jackson along with his

---

[33]St. Rec. Vol. 4 of 9, Trial Transcript (con't), pp. 434-36, 12/10/07-12/14/07.

[34]St. Rec. Vol. 3 of 9, Trial Transcript, pp. 131, 141-42, 12/10/07-12/14/07.

[35]*Id.*, at pp. 175-77, 202, 210, 213.

[36]*Id.*, at pp. 257-59, 261; St. Rec. Vol. 4 of 9, Trial Transcript (con't), p. 302-03, 12/10/07-12/14/07.

[37]St. Rec. Vol. 3 of 9, Trial Transcript, pp. 115, 126, 128, 258, 12/10/07-12/14/07; St. Rec. Vol. 4 of 9, Trial Transcript (con't), p. 283, 12/10/07-12/14/07.

[38]St. Rec. Vol. 3 of 9, Trial Transcript, pp 118, 121, 12/10/07-12/14/07; St. Rec. Vol. 4 of 9, Trial Transcript (con't), pp. 472, 498, 500-01, 12/10/07-12/14/07.

[39]*Id.*, at pp. 287, 499-501.

argument of innocence were presented to the jury and the state courts and resolved against him. For these reasons, Jackson's assertion of actual innocence is not sufficient to meet his burden of establishing that it would be a fundamental miscarriage of justice to fail to consider his claims. He, therefore, has failed to overcome the procedural bar to his claims. The claims of excessive sentence (claim six), non-unanimous jury (claim seven), and newly discovered evidence (claim eight) are procedurally barred and should be dismissed with prejudice.

## V.      Standards for a Merits Review

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000). It provides different standards for questions of fact, questions of law, and mixed questions of fact and law.

A state court's determinations of questions of fact are presumed correct and the Court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485. The "critical point" in determining the Supreme Court rule to be applied "is

that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, __ U.S. __, 134 S. Ct. 1697, 1706-07 (2014) (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *White*, 134 S. Ct. at 1706 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485. A state court's decision can involve an "unreasonable application" of federal law if it correctly identifies the governing rule but then applies it unreasonably to the facts. *White*, 134 S. Ct. at 1706-07; *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law. *See Williams*, 529 U.S. at 410. The Court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law. *Id.* "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

24

Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006). In addition, review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## VI.    **Unfair Trial/Tainted Jury (Claim No. 2)**

Jackson claims his rights to due process and a fair trial by an impartial jury were denied when the Trial Judge took the jury on a "field trip" to a City Council Chamber where members of the Criminal Justice Leadership Alliance spoke to the Criminal Justice Committee of the City Council about the progress made in implementing recommendations of the Vera Institute of Justice. Various representatives from the criminal justice system, including both the Trial Judge and the chief prosecutor, spoke about criminal justice issues including the need to focus resources on violent crimes. Jackson claims that the City Council meeting injected extraneous influences of social issues into the jury's purview and caused the verdict to be influenced by circumstances other than the evidence presented at trial.

Jackson raised this issue on direct appeal to the Fourth Circuit. The Fourth Circuit found that, while there were a few references to the time it takes to go to trial in cases involving violent crimes and the effect of violent crimes on the city, the meeting focused on alternatives to incarceration for non-violent offenders and a pilot program to expedite certain cases through the

court system.  The Fourth Circuit found that the Trial Judge's comments during the City Council hearing, which it explained focused on the use of alternatives to prevent crime and minimize the cost of incarceration, did not constitute comments on the facts of the case or a charge to the jury and were not in violation of La. Code Crim. P. art. 772 or art. 806.  It further found that taking the jury to the meeting did not violate La. Code Crim. P. art. 762, as the meeting was not a session of the court.  Finally, the Fourth Circuit found that Jackson failed to show that the jurors' attendance at the meeting provided them with prejudicial information that contributed to the verdict and, as a result, the Trial Court did not err in denying Jackson's motion for mistrial and motion for new trial.[40]

Jackson raised the issue again in his application for post-conviction relief.  The Trial Court held a hearing at which the Trial Judge testified.[41]  In in denying relief, the Trial Court noted the Fourth Circuit's previous ruling and found that, "Based on the showing made, this court is not convinced that any error that may have arisen as a result of the jurors attending the City Council hearing conducted on December 12, 2007, surely contributed to the verdict."[42]  This was the last reasoned opinion on the issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991) (when the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

---

[40]*State v. Jackson*, 17 So. 3d 523, 2009 WL 8688915, at *13-16 (La. App. 4th Cir. Sept. 9, 2009) (Table, Text in Westlaw); St. Rec. Vol. 7 of 9, 4th Cir. Opinion, 2008-KA-1292, pp. 24-29, 9/09/09.

[41]St. Rec. Vol. 9 of 9, Post-Conviction Hearing Transcript, 7/25/14.

[42]St. Rec. Vol. 9 of 9, Trial Court Judgment, 8/21/15.

The Due Process Clause guarantees an accused the right to an impartial jury that will determine guilt based on the evidence and the law as instructed, rather than on preconceived notions or extraneous information.  *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992); *Patton v. Yount*, 467 U.S. 1025, 1037 n.12 (1984).  "[T]he Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to an external influence."  *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008).  The Court has long held that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."  *Mattox v. United States*, 146 U.S. 140, 150 (1892).  The Court later restated the rule and elaborated on the presumption of prejudice arising from an outside influence:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.  The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Remmer v. United States*, 347 U.S. 227, 229 (1954).

However, the Constitution does <u>not</u> mandate a new trial every time a juror has been placed in a potentially compromising but harmless situation.  *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *United States v. Olano*, 507 U.S. 725, 738-39 (1993).  Due process requires the court to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial." *Remmer*, 347 U.S. at 230.  "[T]he trial judge is in the best position to evaluate accurately the potential impact of the complained-of outside influence" and that determination can be made without an evidentiary hearing.  *United States v. Ramos*, 71 F.3d 1150, 1153-54 (5th Cir. 1995).

To prevail on a claim of denial of due process due to a contaminated jury panel, the petitioner must prove prejudice by establishing the actual existence of an opinion that will raise a presumption of partiality in the jurors' minds. *Murphy v. Florida*, 421 U.S. 794, 800 (1975); *Chavez v. Cockrell*, 310 F.3d 805, 811 (5th Cir. 2002). Whether a jury was impartial "is a question of federal law; whether a juror can in fact do that is a determination to which habeas courts owe special deference." *Patton*, 467 U.S. at 1036-37 & n.12. The effect of an extraneous communication on a juror's impartiality is a question of "historical fact," *Rushen v. Spain*, 464 U.S. 114, 120 (1983); *Patton*, 467 U.S. at 1036-37. The state courts' determinations in that regard are entitled to a presumption of correctness, unless the petitioner "presents 'clear and convincing' evidence to the contrary." *Ward v. Stephens*, 777 F.3d 250, 268 (5th Cir. 2015) (quoting *Oliver*, 541 F.3d at 342 and 28 U.S.C. § 2254(e)(1)).

Even where prejudice is presumed under *Remmer*, habeas petitioners are not entitled to relief based on an improper third-party contact with the jury "unless the error 'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" *Oliver*, 541 F.3d at 341 (alteration in original) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L.Ed.2d 353 (1993)). There must be more than a "reasonable possibility" that the error was harmful. *Brecht*, 507 U.S. at 637 (internal quotation marks omitted).

In this case, it is undisputed that, during the course of the trial, jurors attended the meeting held in the City Council Chamber. The state courts made a finding that the juror's attendance at the City Council meeting did not prejudice the verdict. Jackson's assertion to the contrary "lacks 'even fair support in the record,'" *Ward*, 777 F.3d 250 at 268 (quoting *Rushen v. Spain*, 464 U.S. 114, 120, 104 S. Ct. 453, 78 L.Ed.2d 267 (1983)), much less clear and convincing evidence warranting a different conclusion than that reached by the state courts.

The record reflects that the meeting in the City Council Chamber did not involve the pending trial.  The purpose of the meeting was to update the City Council Criminal Justice Committee regarding the progress of the Criminal Justice Leadership Alliance in its attempt to reform the criminal justice system in New Orleans.  None of the speakers at the meeting discussed the facts of Jackson's case or the evidence.  While there were some occasional and innocuous references to need to focus resources on violent crimes such as murder, the speakers' presentations focused on alternative sanctions for low level offenders and a pilot program to expedite charging and disposition processes for certain cases.[43]  The chief prosecutor and the Trial Judge, who reported on the progress of the Pretrial Work Group, both spoke at the meeting.  However, their comments similarly concentrated on the pilot program and alternatives to incarceration.[44]

Further, there is no evidence that the Trial Judge had an off-record discussion with the jury regarding the facts or evidence related to the case.  The only evidence regarding any conversations the Trial Judge had with the jurors indicates that he advised them that the meeting had nothing to do with Jackson's case.  At the post-conviction hearing, the Trial Judge testified that he assumed that, both prior to attending the meeting and upon their return, he told jurors that the meeting was unrelated to the trial.[45]

Upon their return to the courtroom, the Trial Court, in specifically advising the jurors not to consider what they had heard at the meeting, stated as follows[46]:

> Jurors, just a couple of things – I said this to a group that I was with and I didn't tell it to the entire group – I made everyone in that room aware of the fact that, one, you couldn't be filmed, two, no mention of your presence could be made.  That's

---

[43]St. Rec. Vol. 1 of 9, Criminal Justice Conference Transcript, 12/12/07.

[44]*Id.*, at pp. 8-9, 17-19, 27-33.

[45]St. Rec. Vol. 9 of 9, Post-Conviction Hearing Transcript, pp. 9, 11, 7/25/14.

[46]St. Rec. Vol. 3 of 9, Trial Transcript, pp. 147-48, 12/10/07-12/14/07.

> why no mention of your presence was made. And no film was taken of you in the room. But I also caution you that what you heard has no bearing of affect [sic] or anything on this case. And I know what you heard. That is, that is, what we can do better to keep people from being in jail. That's what you heard. But it has no bearing, whatsoever, on this case.

He also instructed the jury before its deliberations that, "As jurors you are not to be influenced by mere sympathy, passion, prejudice, or public opinion. You are expected to reach a just verdict."[47]

Finally, the evidence that Jackson was the perpetrator of St. Pierre's murder was strong. Given the focus of the meeting, the Trial Court's instructions to the jury, and the strength of the evidence presented at trial, it cannot be said that the jurors' attendance at the meeting had a substantial and injurious effect or influence in determining the jury's verdict.

While Jackson speculates that some of the comments made at that the meeting may have caused the jurors to be partial and affected the jury's verdict, he simply has not provided any evidence of partiality, let alone clear and convincing evidence to rebut the presumption of correctness afforded to the state court's finding that the jurors' presence at the meeting did not prejudice the verdict. Jackson has not established a violation of his right to a fair and impartial jury or trial. Accordingly, the Court finds that the denial of relief on this issue by the state courts was not contrary to, or an unreasonable application of, Supreme Court law. Jackson is not entitled to federal habeas corpus relief.

## VII.    Effective Assistance of Counsel (Claim Nos. 3, 4 and 5)

Jackson alleges that he was denied effective assistance of counsel. He claims that he was denied representation by counsel during a critical stage of the proceedings when the jury attended the meeting at the City Council Chamber. He also claims his trial counsel failed to object to the

---

[47]St. Rec. Vol. 1 of 9, Jury Instructions, p. 268, 272.

"field trip", investigate and present impeachment evidence, confront the firearm testimony, lodge critical objections, move for a mistrial during closing arguments, present mitigating evidence for sentencing purposes, and move for reconsideration of his sentence. Additionally, he cotends that his appellate counsel was ineffective for failing to effectively argue the issues raised on appeal and assign other issues on appeal.

Jackson asserted these arguments in his state application for post-conviction relief. The Trial Court denied the ineffective assistance of counsel claims.[48] The Louisiana Fourth Circuit denied the related writ application.[49] The Louisiana Supreme Court denied relief without stated reasons.[50]

### A.  Standards of Review under *Strickland*

The issue of ineffective assistance of counsel is a mixed question of law and fact. *Clark v. Thaler*, 673 F.3d 410, 416 (5th Cir. 2012); *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir. 2010). The question for this Court is whether the state courts' denial of relief was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom. *Strickland*, 466 U.S. at 687. The petitioner has the burden of proving ineffective assistance of counsel by a preponderance of the evidence. *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000); *Jernigan v. Collins*, 980 F.2d 292, 296 (1992). In

---

[48]St. Rec. Vol. 9 of 9, Trial Court Judgment, 8/21/15.

[49]St. Rec. Vol. 9 of 9, 4th Cir. Order, 2015-K-1195, 1/26/16.

[50]*State ex rel. Jackson v. State*, 208 So.3d 883 (La. 2017) (per curiam); St. Rec. Vol. 9 of 9, La. S. Ct. Order, 2016-KP-0352, 1/9/17.

deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. *Amos v. Scott*, 61 F.3d 333, 348 (1995).

To prevail on the deficiency prong, a petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "The defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. The analysis of counsel's performance must take into account the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances. *See Strickland*, 466 U.S. at 689; *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009). The reviewing court must "judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 689). "[I]t is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell*, 535 U.S. at 702 (citing *Strickland*, 466 U.S. at 689). As a result, federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. *Strickland*, 466 U.S. at 689; *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (counsel's "'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'") (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)); *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008).

In order to prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010). Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice." *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695). In this context, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at. 694). This standard requires a "substantial," not just "conceivable," likelihood of a different result. *Harrington*, 562 U.S. at 112. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett v. McCotter*, 796 F.2d 787, 793 (5th Cir. 1986). Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. *Miller*, 200 F.3d at 282 (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

On habeas review, the United States Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105 (citing *Strickland*, 466 U.S. at 690). The *Harrington* Court went on to recognize the high level of deference owed to a state court's findings under *Strickland* in light of AEDPA standards of review:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is

> not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 105 (citations and quotation marks omitted).

Thus, scrutiny of counsel's performance under § 2254(d) therefore is "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009)). This Court must therefore apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690; *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999).

Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise by the petitioner. *Strickland*, 466 U.S. at 689; *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008); *Moore*, 194 F.3d at 591. In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. *Strickland*, 466 U.S. at 689; *Neal*, 286 F.3d at 236–37; *Clark v. Johnson*, 227 F.3d 273, 282–83 (5th Cir. 2000). Tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance. *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999) (citing *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997) and *Mann v. Scott*, 41 F.3d 968, 983–84 (5th Cir. 1994)).

### B. Denial of Counsel at Critical Stage

Jackson argues that he was denied counsel at a critical stage of the proceedings under *United States v. Cronic*, 466 U.S. 648 (1984), and its progeny when defense counsel did not attend the City Council meeting.

In *Cronic*, the Supreme Court held that a defendant may be constructively denied counsel, even though an attorney had been appointed to represent him. The *Cronic* presumption of

prejudice arises in circumstances where: (1) there exists a "complete denial of counsel" or a denial of counsel "at a critical stage" of defendant's trial; (2) defense counsel fails to "subject the prosecution's case to meaningful adversarial testing"; or (3) counsel "is called upon to render assistance where competent counsel very likely could not." *Cronic*, 466 U.S. at 658-59, 104 S.Ct. 2039 (citations omitted). Only in these "circumstances of magnitude" may "the likelihood that the verdict is unreliable [be] so high" that a constitutional violation may be found. *Mickens v. Taylor*, 535 U.S. 162, 166 (2002). A critical stage is one that "held significant consequences for the accused." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (citing *Bell v. Cone*, 535 U.S. 685, 696 (2002)).

The issue of the constructive denial of counsel under *Cronic* is a mixed question of law and fact. *French v. Jones*, 225 F.3d 658, 2000 WL 1033021, at *3 (6th Cir. Jul. 18, 2000) (Table, Text in Westlaw). Thus, the question before this Court is whether the state courts' denial of relief on this issue was contrary to or an unreasonable application of United States Supreme Court precedent.

No decision from the Supreme Court addresses whether a public meeting attended by jurors during the course of the trial, such as the City Council meeting in this case, is a "critical stage" of the proceedings. The law is clear that when there is no Supreme Court precedent to control a legal issue raised by a habeas petitioner, the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law, and no federal habeas relief is warranted. *See Woods*, 135 S.Ct. at 1377 (*citing Lopez v. Smith*, 135 S.Ct. 1, 4 (2014) (per curiam) ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be "contrary to" any holding from this Court."); *Wright v. Van Patten*, 552 U.S.

120, 126 (2008) (quotation omitted) ("Because our cases give no clear answer to the question presented, let alone one in Van Patten's favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law."); *Higginbotham v. Louisiana*, 817 F.3d 217 (5th Cir. 2016) (No violation of clearly established law where "the Supreme Court does not appear to have addressed this issue or a 'materially indistinguishable' set of facts"), *cert. denied*, 137 S. Ct. 506 (2016); *Gomez v. Thaler*, 526 F. App'x 355, 359-60 (5th Cir. 2013) (citing *Van Patten*, 552 U.S. at 126) (When no Supreme Court precedent directly addressed the presented issue, it could not be said that the state court unreasonably applied clearly established federal law.).

Accordingly, the Court finds that the denial of relief on this issue by the state courts was not contrary to, or an unreasonable application of, Supreme Court law. Jackson is not entitled to federal habeas corpus relief as to this issue.

### C. **Trial Counsel**

Jackson presents seven alleged errors by his trial counsel. He claims trial counsel failed to: (a) contemporaneously object to the Trial Judge taking the jury on a mid-trial "field trip" to the City Council meeting; (b) investigate and present impeachment evidence attacking credibility of the State's witnesses; (c) effectively confront the firearm testimony; (d) lodge critical objections; (e) move for a mistrial after the prosecutor made improper and prejudicial statements during closing argument; (f) present mitigating evidence in support of a sentence less than life without parole; and (g) move for reconsideration of the excessive sentence.

In the instant case, Jackson fails to establish that his counsel's performance was objectively unreasonable or deficient under the circumstances of his case or that there is a reasonable

probability that, but for his counsel's actions, the result of the proceedings would have been different.

### **(1) Failure to Contemporaneously Object to Field Trip**

Jackson first claims that his counsel was ineffective for failing to contemporaneously object to the "field trip" to the City Council Chamber.

It is undisputed that defense counsel did not object at the time the Trial Court advised of its intention to take the jurors to the City Council meeting.[51]  However, after the jurors returned from the meeting and the trial resumed, defense counsel learned that issues of crime were discussed at the meeting and voiced an objection to the jurors' attendance.[52]  Counsel explained that she had not been aware of the nature of the meeting and that she not aware criminal justice issues would be discussed.[53]

Jackson has failed to show prejudice as a result of defense counsel's failure to contemporaneously object to the jurors' attendance at the meeting.  The Fourth Circuit did not find the issue relating to the "field trip" procedurally barred as a result of the lack of a contemporaneous objection.  It rather found that the objection made after counsel became aware of the subject matter of the meeting was sufficient to preserve the issue, but nevertheless found the claim meritless.[54]  The state courts considered the issue regarding the jurors' attendance at the meeting a second time

---

[51]St. Rec. Vol. 3 of 9, Trial Transcript, pp. 143, 147, 12/10/07-12/14/07.

[52]*Id*., at pp. 197-98.

[53]*Id*., at p. 197.

[54]*State v. Jackson*, 17 So. 3d 523, 2009 WL 8688915, at 13-16 (La. App. 4th Cir. Sept. 9, 2009) (Table, Text in Westlaw); St. Rec. Vol. 7 of 9, 4th Cir. Opinion, 2008-KA-1292, pp. 24-29, 9/9/09.

on post-conviction review and rejected it.  For the reasons previously discussed in this Report, Jackson has not established a violation of his right to a fair trial or an impartial jury or trial.

The state courts' denial of relief on this issue was not contrary to, or an unreasonable application of, *Strickland*.  Jackson is not entitled to relief on this claim.

### (2) Failure to Impeach Witnesses & Effectively Confront Firearm Testimony

Jackson next claims that defense counsel failed to investigate and present impeachment evidence attacking the State's witnesses.  In a related claim, Jackson contends that defense counsel failed to "effectively confront firearm testimony."[55]

While Jackson alleges that counsel did not investigate, he does not indicate what counsel should have investigated.  A federal habeas court will not find deficient performance where counsel's decision not to investigate was part of a clearly developed defensive strategy or where the defendant can point to no specific evidence that would have been uncovered by a more thorough investigation.  *Nealy v. Cabana*, 764 F.2d 1173, 1178 (5th Cir. 1985) (citing *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984), *Larsen v. Maggio*, 736 F.2d 215, 218 (5th Cir. 1984) and *United States v. Cockrell*, 720 F.2d at 1428-29)).

Jackson also claims his defense counsel failed to impeach the State's witnesses and did not effectively confront the firearm testimony.  A decision whether and, if so, how to impeach a witness falls within the purview of counsel's trial strategy.  It is clear that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment."  *Ford v. Cockrell*, 315 F.Supp.2d 831, 859

---

[55]Rec. Doc. 1, p. 27.

(W.D. Tex. 2004), *aff'd*, 135 F. App'x 769 (5th Cir. 2005); *see also Lewis v. Cain*, Civ. Action

No. 09–2848, 2009 WL 3367055, at *8 (E.D. La. Oct. 16, 2009), *aff'd*, 444 F. App'x 835 (5th Cir.

2011); *Williams v. Cain*, Civ. Action Nos. 06–0224 and 06–0344, 2009 WL 1269282, at *11 (E.D.

La. May 7, 2009), *aff'd*, 359 F. App'x 462 (5th Cir. 2009), *cert. denied*, 130 S.Ct. 2107 (2010);

*Packnett v. Cain*, Civ. Action No. 06–5973, 2008 WL 148486, at *11 (E.D. La. Jan. 10, 2008);

*Parker v. Cain*, 445 F.Supp.2d 685, 710 (E.D. La. 2006).  The United States Supreme Court has

cautioned courts not to second-guess counsel's decisions on such tactical matters through the

distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's

conduct falls within a wide range of reasonable assistance and, under the circumstances, might be

considered sound trial strategy.  *Strickland*, 466 U.S. at 689.

On federal habeas corpus review, "[a] conscious and informed decision on trial tactics and

strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill

chosen that it permeates the entire trial with obvious unfairness."  *Garland v. Maggio*, 717 F.2d

199 (5th Cir. 1983); *see also Pape v. Thaler*, 645 F.3d 281 (5th Cir. 2011).  "'Failure to present

[evidence does] not constitute "deficient" performance within the meaning of *Strickland* if

[counsel] could have concluded, for tactical reasons, that attempting to present such evidence

would be unwise.'"  *Williams v. Cockrell*, 31 F. App'x 832, 2002 WL 180359, at *3 (5th Cir. Jan.4,

2002) (quoting *Williams v. Cain*, 125 F.3d 269, 278 (5th Cir.1997)).

Here, Jackson's generalized claims remain wholly unsupported.  He fails to identify any

particular testimony which his counsel should have impeached.  Nor does he identify any relevant

questions that counsel failed to ask on cross-examination.  Moreover, the Court has reviewed the

transcripts in their entirety and finds that counsel's cross-examination and attempts to challenge

the witnesses' credibility were not deficient and that Jackson was not prejudiced by counsel's performance.

The Court presumes that Jackson's claim that counsel failed to effectively confront firearm testimony relates to the testimony of Officer Kenneth Leary.  A review of the trial transcript shows that Leary, the State's expert in firearms and toolmark examination, testified that he compared shell casings and bullets found in St. Pierre's home with a test bullet casing fired from the nine-millimeter handgun found in the vehicle Jackson was driving on July 11, 2001 and found that all of the bullet casings and bullets were fired from that gun.[56]  Defense counsel made numerous objections throughout both direct and re-direct examination.[57]  On cross-examination, defense counsel actively challenged Leary's qualifications and pointed out deficiencies in Leary's report.[58]  Defense counsel was able to elicit admissions from Leary that he had no independent recollection of the testing, he was not a member of the only national professional organization for firearms examiners, and that the lab was unaccredited.[59]  Leary also admitted that his report did not include any description of markings on the bullets, shell casings, or the test fire bullet, and that he did not test any of the bullets recovered from the autopsy.[60]

Jackson has not alleged facts or otherwise suggested what other line of questioning his defense counsel could have pursued to further undermine Leary's testimony.  He is required to

---

[56] St. Rec. Vol. 3 of 9, Trial Transcript, pp. 214-253, 12/10/07-12/14/07.

[57] Id., at pp. 217, 219, 247, 248, 251, 252.

[58] Id., at pp. 236-246, 252-53.

[59] Id. at pp. 236, 239, 242.

[60] Id. at pp. 237, 245.

present more than conclusory assertions to establish ineffective assistance of counsel. *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue.").

The denial of relief on this issue was not contrary to, or an unreasonable application of, *Strickland*. Jackson is not entitled to relief on these claims.

### (3) Failure to Lodge Critical Objections

Jackson next argues his counsel was ineffective for failing to "lodge critical objections."[61] This claim, though conclusorily stated in his petition, is not factually supported or explained in any way. He provides the Court with no specifics as to when defense counsel should have objected, what the basis for the objection should have been, or whether the outcome would have been different had counsel objected.

It is well settled that conclusory allegations are not adequate to establish ineffective assistance of counsel. *See Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."); *Brown*, 419 F.3d at 375; *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998); *United States v. Daniels*, No. 08–104, 2011 WL 999529, at *7 (E.D. La. Mar. 18, 2011) (citing *Moawad*, 143 F.3d at 948; *Brown*, 419 F.3d at 375; and *Kron v. Tanner*, No. 09–7572, 2010 WL 3488227, at *11 n. 26 (E.D. La. May 4, 2010)).

The state courts' denial of relief on this issue was not contrary to, or an unreasonable application of, *Strickland*. Jackson is not entitled to habeas relief as to this claim.

---

[61]Rec. Doc. 1, p. 27.

### (4) **Failure to Move for a Mistrial**

Jackson next claims he was denied effective assistance of trial counsel when his counsel failed to object to or move for a mistrial when the prosecution, during closing arguments, made improper and prejudicial statements.

Jackson fails to identify in his federal petition the particular portion of closing arguments giving rise to his complaints. However, the record demonstrates that defense counsel objected on numerous occasions and throughout the State's closing argument and in fact moved for a mistrial at the conclusion of closings when the Trial Court allowed defense counsel to explain her objections for the record.[62] At that time, defense counsel stated as follows[63]:

> During closing I made a number of objections a number of times. I asked to approach a number of times, in order to state my objections to the Court. My objections are that the state misstated the evidence, specifically, attacking the defense's strategy and called attention to us as lawyers, as a defense team who wanted our client to walk out the door. The state shifted the burden of proof a number of times, mischaracterized the defense's argument. And specifically, the state gave two sentences in which they said the defendant has an absolute right not to testify, but only two people know what happened to Anthony St. Pierre. And that is clearly an allusion [sic] to the defendant's failure to testify. Based on all these, we would move for a mistrial.

As the record clearly demonstrates that defense counsel objected to the State's closing argument and moved for a mistrial, Jackson has failed to show deficient performance or resultant prejudice. The state courts' denial of relief on this issue was not contrary to, or an unreasonable application of, *Strickland*.

---

[62]St. Rec. Vol. 4 of 9, Trial Transcript (con't), pp. 566-572, 12/10/07-12/14/07.

[63]*Id.*, at p. 572.

### (5) Failure to Present Mitigating Evidence at Sentencing

Jackson alleges that his counsel was ineffective for failing present evidence of mitigation at sentencing. He, however, does not expound on this argument or point to any specific mitigating evidence which could have been discovered or should have been presented by counsel.

It is well established that counsel has "a duty to make reasonable investigations" into potential mitigating evidence or "to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (addressing sentencing in capital cases) (quoting *Strickland*, 466 U.S. at 690-91). Thus, "defense counsel's failure to engage in an appropriate investigation of potential mitigating evidence in the punishment phase can support a claim of ineffective assistance of counsel." *Smith v. Cockrell*, 311 F.3d 661, 668–69 (5th Cir. 2002) (citing *Williams v. Taylor*, 529 U.S. 362, 390 (2000)). In determining whether trial counsel's performance was deficient, courts must "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [a petitioner's] background was itself reasonable." *Wiggins*, 539 U.S. at 522–23 (emphasis in original).

However, the Supreme Court also has emphasized that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing," nor "does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case." *Wiggins*, 539 U.S. at 532–533. Rather, *Strickland* requires counsel to ensure that the decision to limit investigations is supported by "reasonable professional judgment." *Id.*

At the outset, however, the burden is on Jackson to establish that counsel erred in failing to investigate mitigating evidence. "'A defendant who alleges a failure to investigate on the part

of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'"  *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998) (citation omitted) (emphasis added).  A petitioner cannot show prejudice with respect to a claim that counsel failed to investigate and present mitigating evidence without adducing what the investigation would have shown.  *Diaz v. Quarterm*an, 239 F. App'x 886, 890 (5th Cir. 2007) (citing *Strickland*, 466 U.S. at 696 in recognizing that some evidence is required to show that "the decision reached would reasonably likely have been different.").

In this case, Jackson has not pointed to any potential mitigating evidence which should have been discovered or investigated and presented by counsel.  He also has not alleged what, if any, information a more thorough search of his background would have revealed or how such information would have altered the statutorily mandated sentence he received.  His vague and unsupported claim alone is not sufficient to establish a deficiency in counsel's performance or any prejudice resulting from counsel's representation.  *See Brown v. Dretke*, 419 F.3d 365, 375 (5th Cir. 2005).

The state courts' denial of relief on this claim was neither contrary to, nor an unreasonable application of, *Strickland*.  Jackson is not entitled to relief on this claim.

### (6)  <u>Failure to File a Motion to Reconsider Sentence as Excessive</u>

Jackson's final claim of ineffective assistance of trial counsel is based upon defense counsel's failure to file a motion to reconsider the sentence.  Jackson's argument is conclusory, and he has failed to allege a legal basis for counsel to have filed a motion to reconsider on that ground.

Nevertheless, even if the Court were to assume that counsel performed deficiently in not filing a motion to reconsider sentence, petitioner's ineffective assistance claim still fails because he cannot show that he was prejudiced as a result. Jackson was convicted of second degree murder. In Louisiana, "[w]hoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." La. Rev. Stat. § 14:30.1(B). This is the sentence Jackson received from the state trial court, and it is the statutorily required sentence for second degree murder.

As the Louisiana second degree murder statute does not give a sentencing judge any discretion to impose a sentence other than the one Jackson received, there is no reasonable probability that, had counsel filed a proper motion to reconsider sentence, the motion would have been granted or the sentence would have been found excessive on appeal. Accordingly, Jackson cannot show that he was prejudiced by the failure of counsel to file such a motion.

### (D)  Appellate Counsel

Jackson lists without discussion the ways he contends his appellate counsel was ineffective. He claims appellate counsel was ineffective for failing to: (1) effectively present for appellate review the four assigned errors in the appellate brief; and (2) appeal other errors including (a) violation of jury sequestration under La. Code Crim. P. art. 791; (b) violation of Jackson's right to be present at all proceedings where the jury is present under La. Code Crim. P. art. 831(5); (c) excessive sentence; (d) non-unanimous verdict; and (e) violation of Jackson's right to poll the jury.

The *Strickland* standard also applies to claims of ineffective assistance of appellate counsel. *Duhmel v. Collins*, 955 F.2d 962, 967 (5th Cir. 1992) (citing *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991)). In reviewing claims of ineffective assistance of appellate counsel, the Supreme

Court has expressly observed that appellate counsel "need not advance every argument, regardless of merit, urged by the [ ] defendant. *Evitts v. Lucey*, 469 U.S. 387, 394 (1985).  When alleging ineffective assistance of appellate counsel, the defendant "must show that the neglected claim would have had a reasonable probability of success on appeal."  *Duhmel*, 955 F.2d at 967. However, failing to raise every meritorious claim on appeal does not make counsel deficient. *Green v. Johnson*, 116 F.3d 1115, 1125-26 (5th Cir. 1997) (citing *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir. 1989)).   Similarly, failing to raise a frivolous claim "does not cause counsel's performance to fall below an objective level of reasonableness."  *Green v. Johnson*, 160 F.3d at 1037 (5th Cir. 1998).  Courts give great deference to professional appellate strategy and applauds counsel for "winnowing out weaker arguments on appeal and focusing on one central issue if possible, and at most a few key issues...." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  This is true even where the weaker arguments have merit. *Id*. at 751–52.  Instead, the applicable test is whether the omitted issue was "clearly stronger" than the issue[s] actually presented on appeal.  *See*, *e.g.*, *Diaz v. Quarterman*, 228 F. App'x 417, 427 (5th Cir. 2007); *see also Smith v. Robbins*, 528 U.S. 259, 288 (2000).

Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions."  *Jones*, 463 U.S. at 753.  [I]t is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent."  *Smith*, 528 U.S. at 288; *see also United States v. Tucker*, 434 F. App'x 355, 362 (5th Cir. 2011) (per curiam) ("The Supreme Court has recognized 'the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review.' " (quoting *Jones*, 463 U.S. at 752).  To reiterate,

the issues appellate counsel failed to assign must have been "clearly stronger" than those issues actually presented on appeal.  *See, e.g.*, *Diaz*, 228 F. App'x at 427; *see also Smith*, 528 U.S. at 288.

## 1. **Effectively Present Claims on Appeal**

Jackson first claims his appellate counsel failed to "effectively present" the issues on appeal.  On appeal, Jackson's counsel raised four issues: (1) the Trial Court erred in admitting evidence of letters written by Jackson to St. Pierre; (2) the Trial Court erred in failing to grant the motion for mistrial or motion for new trial based on the jurors' attendance at the meeting in the City Council Chamber; (3) the Trial Court erred in overruling objections and denying a motion for mistrial based on the prosecutor's misconduct during closing arguments; and (4) insufficient evidence supported the conviction.

Jackson offers no explanation as to how his counsel's presentation of these claims on appeal was inadequate or how he should have couched the claims differently.  While the claims were ultimately found to be without merit, Jackson fails to establish a reasonable probability that, but for the manner in which his counsel addressed the issues on direct appeal, he would have prevailed on appeal.

Jackson has not demonstrated that the state courts' decision rejecting this ineffective assistance of appellate counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

### 2. **Failure to Raise Other Issues on Appeal**

While Jackson claims that his appellate counsel was ineffective for failing to raise other claims on appeal, he offers no discussion of or explanation concerning the alleged validity of the claims. His arguments are wholly conclusory and offer no basis to establish that a meritorious argument was overlooked by his appellate counsel. In fact, many of the issues were not preserved for appellate review by objection or do not demonstrate error by the Trial Court. As a result, for the reasons that follow, Jackson has failed to establish that any of his claims were non-frivolous or would have been likely to succeed on appeal.

### (i) **Violation of Rule of Sequestration**

Jackson claims his counsel should have assigned as error violation of jury sequestration under La. Code Crim. P. art. 791.

In this case, the jury was not sequestered before it began deliberations nor was it required to be under Louisiana law. Specifically, Louisiana law does not mandate sequestration of the jury during the trial of a non-capital offense. La. Code Crim. P. art. 791. Jackson was indicted and tried for second degree murder, which is not a capital offense in Louisiana. While a jury is required to be sequestered after it is charged, La. Code Crim. P. art 791(C), Jackson presents no evidence that the jury was not sequestered once it began deliberations.

Thus, there was no legal basis for Jackson's appellate counsel to have assigned as error violation of the rule of jury sequestration. The state courts' denial of relief on this issue was neither contrary to, nor an unreasonable application of, Supreme Court law.

### (ii)    Violation of Art. 831(5)

Jackson next claims his appellate counsel should have challenged the Trial Court's denial of his right to be present at all proceedings where the jury is present under La. Code Crim. P. art. 831(5).

La. Code Crim. P. art. 831(5) provides that a defendant shall be present "[i]n trials by jury, at all proceedings when the jury is present, and in trials without a jury, at all times when evidence is being adduced."  Art. 831 "establishes a defendant's due process right to be present at every *stage of the trial* when his absence might frustrate the fairness of the proceeding."  *State v. Williams*, 190 So. 3d 737, 743 (La. App. 2d Cir. 2016) (emphasis added), *writ denied*, 216 So. 3d 801 (La.), *cert. denied*, 138 S. Ct. 387 (2017).

There is no evidence establishing that Jackson was not present at every stage of his trial. The City Council meeting involving the Criminal Justice Leadership Alliance, while attended by the jury, was not a proceeding of the Trial Court and occurred while the trial was in recess.  Given that the Fourth Circuit explicitly found that the meeting was not a "session of the court" under La. Code Crim. P. art. 762, [64] Jackson has not demonstrated that his appellate counsel's decision not to raise a claim on appeal that his absence at the meeting violated art. 831(5) was objectively unreasonable or that but for her failure to raise the issue the result of the proceeding would have been different.

The denial of relief on this issue was neither contrary to, nor an unreasonable application of, Supreme Court law.  Jackson is not entitled to relief on this claim.

---

[64] *State v. Jackson*, 17 So. 3d 523, 2009 WL 8688915, at *16 (La. App. 4th Cir. Sept. 9, 2008) (Table, Text In Wstlaw); St. Rec. Vol. 7 of 9, 4th Cir. Opinion, No. 2008–KA–1292, p. 28, 9/9/08;

### (iii)    Non-Unanimous Verdict

Jackson also alleges that appellate counsel was ineffective for failing to assert on appeal that the non-unanimous verdict violated his constitutional rights.

There was no legal basis for Jackson's appellate counsel to have challenged Louisiana's non-unanimous verdict rule.  The well established law left no reason for Jackson's appellate counsel to urge this meritless claim.  In *Apodaca v. Oregon*, 406 U.S. 404 (1972), and *Johnson v. Louisiana*, 406 U.S. 356 (1972), the United States Supreme Court upheld the constitutionality of state laws—including Louisiana's—that permit criminal defendants to be convicted by less than unanimous votes.  While the Supreme Court itself has recently described the *Apodaca*/*Johnson* holding as "the result of an unusual division among the Justices," it also made clear in the same breath that *Apodaca*/*Johnson* remains the law of the land: "The [Supreme] Court has held that although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in state criminal trials."  *McDonald v. City of Chicago*, 561 U.S. 742, 766 n.14 (2010).  Jackson's counsel did not err in failing to urge a meritless challenge to Louisiana's non-unanimous verdict law.

Jackson's appellate counsel did not act deficiently in failing to raise the issue of non-unanimous verdict.  The denial of relief on this issue was neither contrary to nor an unreasonable application of *Strickland* and its progeny.  Jackson is not entitled to relief on this issue.

### (iv)    Denial of Right to Poll Jury

Jackson next claims he was denied effective assistance when his appellate counsel failed to assign as error on appeal the Trial Court's denial of defense counsel's request to poll the jury.

50

La. Code Crim. P. art. 812 requires the court to order the clerk to poll the jury if requested by the State or the defendant.  However, it is within the court's discretion to determine whether the poll shall be conducted orally or in writing.[65]

In this case, while the Trial Court denied defense counsel's request to have the jury orally polled, the record reflects that a written polling of the jury occurred.[66]  Prior to the verdict being read, the Trial Court stated, "And I'm looking at these slips, these ballot slips.  And I see one, two, three, four, five, six, seven, eight, nine, ten bearing the word yes, and two bearing the word no."[67]  Both the State and the defense reviewed the slips before they were destroyed.[68]  The Trial Court, in denying the defense's request to have the jury orally polled after the verdict was read, stated, "As to the request to poll the jury and then have the jurors in this box in this open-court setting is what you're requesting happen, have them tell in that jury box up there what their decision was.  They've given us their decision.  And they gave us, in writing, each of them, a slip bearing their

---

[65]The procedure for the written polling of the jury is set forth in La. Code Crim. P. art. 812(2), which provides:

(2) The procedure for the written polling of the jury shall require that the clerk hand to each juror a separate piece of paper containing the name of the juror and the words "Is this your verdict?"  Each juror shall write on the slip of paper the words "Yes" or "No" along with his signature.  The clerk shall collect the slips of paper, make them available for inspection by the court and counsel, and record the results.  If a sufficient number of jurors as required by law to reach a verdict answer "yes" the clerk shall so inform the court.  Upon verification of the results, the court shall order the clerk to record the verdict and order the jury discharged.  If an insufficient number required to find a verdict answer "Yes," the court may remand the jury for further deliberation, or the court may declare a mistrial in accordance with Article 775.

[66]St. Rec. Vol. 4 of 9, Trial Transcript (con't), pp. 575- 576, 12/10/07-/12/14/07.

[67]*Id*., at p. 575.

[68]*Id*., at pp. 575-76.

decision, which both the defense and the state were able to see. To have them in that jury box repeat that, I see unnecessary, but also has other kinds of issues. And so that's denied."[69]

While the Trial Court committed a technical error in giving the jurors individual polling sheets prior to the return of the verdict in open court, Jackson has not alleged any prejudice as a result of the polling method. Similar technical errors in polling the jury have been held to be harmless. *State v. Valenzuela*, 590 So. 2d 89, 99 (La. App. 4th Cir. 1991) (trial court's technical error in giving jurors verdict sheet and poll sheet prior to their deliberations did not affect any substantial rights of the defendant.)

In light of the foregoing, Jackson has not shown a reasonable probability that he would have prevailed on appeal if the issue had been raised. Denial of relief on this issue was neither contrary to, nor an unreasonable application of, Supreme Court law. Jackson is not entitled to relief as to this claim.

### (v)    **Excessive Sentence**

Jackson's final claim is that appellate counsel was ineffective for failing to appeal his sentence as excessive.

As addressed previously, defense counsel did not file a motion to reconsider the sentence. A motion to reconsider sentence would have been necessary to preserve the error for review on direct appeal. La. Code Crim. P. art. 881.1(E) ("[f]ailure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an

---

[69]*Id.*, at p. 576.

objection to the sentence or from urging any ground not raised in the motion on appeal or review."); *State v. Adair*, 875 So. 2d 972, 974–975 (La. App. 5th Cir. 2004). Without the claim being properly preserved for review on direct appeal, appellate counsel was not in a position to raise the claim on appeal. Appellate counsel cannot be considered ineffective "in declining to raise an unreviewable issue." *Givens v. Cockrell*, 265 F. 3d 306, 310 (5th Cir. 2001).

Therefore, appellate counsel was not deficient for failing to raise the issue on appeal, and Jackson suffered no prejudice. Accordingly, Jackson's instant claim fails because he cannot show a reasonable probability that he would have prevailed on appeal if the issue had been raised." *Weatherspoon v. Cain*, Civ. Action No. 10-4500, 2011 WL 4351397, at *34 (E.D. La. July 8, 2011) ("[A]ppellate counsel was precluded from raising this claim because there had been no contemporaneous objection at trial. Therefore, appellate counsel was not deficient for failing to raise the issue on appeal, and petitioner suffered no prejudice. Accordingly, petitioner's instant claim fails because he cannot show a reasonable probability that he would have prevailed on appeal if the issue had been raised.") (citations omitted), *report and recommendation adopted*, 2011 WL 4063611 (E.D. La. Sept. 13, 2011); *Arceneaux v. Cain*, Civ. Action No. 06-3964, 2009 WL 917429, at *10 (E.D. La. Mar. 31, 2009) ("Where appellate review of a claim would be barred due to the absence of a contemporaneous objection, appellate counsel is not ineffective for failing to assert the claim."); *Taylor v. Holliday*, Civ. Action No. 06–4118, 2008 WL 5146505, at *8 (E.D. La. Dec.4, 2008) (petitioner failed to demonstrate ineffective assistance of appellate counsel when issue was not preserved for appeal).

For the foregoing reasons, Jackson has not shown that his appellate counsel failed to raise a nonfrivolous or potentially meritorious issue on direct appeal. He has not demonstrated any

deficient performance on the part of his appellate counsel or shown any prejudice caused by counsel's failure to assert these meritless and unsupportable claims in his appeal.  The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court law.  Jackson is not entitled to relief on this issue.

## VIII.   Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Jackson's petition for the issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[70]

New Orleans, Louisiana, this 27th day of February, 2018.

**KAREN WELLS ROBY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

---

[70]*Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.